**WO** SKC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Grant Gardner,

Plaintiff,

v.

Phoenix, City of, et al.,

Defendants.

No. CV-23-02120-PHX-MTL (DMF)

**ORDER**

Plaintiff Grant Gardner brought this civil rights action through counsel pursuant to 42 U.S.C. § 1983. Defendants the City of Phoenix (the "City") and City of Phoenix Police Officer Johnny Reid move for partial summary judgment on Plaintiff's Fourth Amendment excessive-use-of-force and state law assault and battery claims. (Doc. 57.) The Motion is fully briefed. (Doc. 63, 66.) The Court will grant the Motion.

## I. Background

In his First Amended Complaint, Plaintiff brought a Fourth Amendment excessive-use-of-force claim against Defendant Reid in Count One and supplemental state law assault, battery, and negligence claims against Defendant Reid and the City based on vicarious liability for Reid's actions in Counts Two, Three, and Four. (Doc. 16.)[1]

Defendants previously moved to dismiss all claims for failure to state a claim pursuant to Rule 12(b) of the Federal Rules of Civil Procedure (Doc. 17), and the Court

---

[1] Plaintiff also sought to bring the state law claims against unidentified Doe Defendants 1-50, but he later voluntarily dismissed the Doe Defendants. (Doc. 31.)

granted the Motion in part and denied it in part. (Doc. 20.) The Court granted the Motion as to Plaintiff's negligence claim against the City in Count Four to the extent that claim was based on vicarious liability for Defendant Reid's alleged simple negligence because, under Arizona law, public entities are shielded from liability for the torts of their employees when carrying out discretionary duties, such as are at issue here, "unless the conduct rises to gross negligence or recklessness." (*Id.* at 14−15 (quoting *Jennings v. Agne in & for Cnty. of Maricopa*, 520 P.3d 665, 669 (Ct. App. 2022).) The Court denied the Motion as to all other claims, including Plaintiff's negligence claim against the City in Count Four to the extent that claim was based on vicarious liability for Defendant Reid's alleged gross negligence. (*Id.*)[2]

Defendants now seek Partial Summary Judgment on Plaintiff's Fourth Amendment and state law claims against Defendant Reid in all Counts and Plaintiff's state law assault and battery claims against the City in Counts Two and Three. (Doc. 57.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

[2] In his First Amended Complaint, Plaintiff merely asserted a negligence claim without designating whether it was based on simple negligence or gross negligence, and the Court found that he alleged sufficient facts, taken as true, to support a gross negligence claim. (Doc. 20 at 15.)

governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge does not weigh the evidence and determine the truth but instead determines whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need not consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Facts

On December 11, 2022, at approximately 8:31 p.m., Defendant Reid was riding with Officer Phillip Wellwerts when the officers responded to a dispatch they either heard over the radio or read in their computer aided dispatch asking officers to respond to assist officers being shot at near 1030 N. 3rd Street. (Doc. 58, Defs.' Statement of Facts (DSOF) ¶¶ 11−12; Doc. 64, Pl.'s Controverting Statement of Facts (PCSOF) ¶ 12.) Dispatch advised that the shooting suspect was a black male wearing a red hoodie and carrying a black handgun. (DSOF ¶ 13.) Upon arriving at the scene, the officers were directed to Barcoa Agaveria, a bar at 829 N. 1st Ave, and Defendant Reid determined, based on the nature of the incident, to "deploy" his rifle. (*Id.* ¶¶ 14−15.) Video from Defendant Reid's bodycam shows Defendant Reid exit his patrol vehicle and cock a rifle and strap it over his shoulder; then, Defendant Reid and several other officers converge in the street and start walking into a parking lot. (Def. Ex 9, Reid Bodycam at 01:30−40, time 20:32:30.) Ahead of the officers, at the far end of the parking lot, is a lighted outdoor patio skirting the outside of a building. (*Id.*)

While crossing the parking lot, Defendant Reid saw a black male, later identified as the Barcoa parking lot attendant/valet Aaron Frazier, wearing a red upper garment that could have been a red jacket or hoodie, standing on the patio. (*Id.*; Doc. 58-7, Reid Decl. ¶ 9.)[3] Reid and other responding officers approached the patio with weapons drawn, shouting commands to bystanders to move out of the way. (DSOF ¶ 18.) At the same time, Defendant Reid and the other officers commanded Mr. Frazier from across the parking lot to put his hands in the air; Defendant Reid yelled, "you in the red, put your hands up, right now!" and "everyone get away from him, right now!" (*Id.* ¶ 19; Def. Ex. 9, Reid bodycam at 01:21–35.) Defendant Reid also directed several other officers, including Officer Taylor Drake, who was aiming a less-lethal 40 mm round launcher[4] towards the patio, to go "straight ahead"; Defendant Reid also yelled "do not move!" while advancing in the direction of the patio. (DSOF ¶ 20; Reid bodycam at 01:42–45.) Several officers then began charging toward the patio in front of Defendant Reid, and Officer Drake fired a less-lethal 40 mm round, striking Frazier. (DSOF ¶¶ 20–21; Reid bodycam at 2:44–47.)

---

[3] Plaintiff objects to Defendant Reid's declaration testimony that he saw a black male wearing a red jacket or a red hoodie on the ground that this statement contradicts other evidence Reid gave under oath at his deposition, when he admitted that he wrote in his incident report that Mr. Frazier was wearing a red jacket. (PCSOF ¶ 14.) This objection is overruled. There is no material dispute between these accounts because, in his declaration, Defendant Reid describes what he saw when approaching the patio from the parking lot, and in his report, he describes the facts known to him after Mr. Frazier was detained.

[4] Defendants did not provide any explanation of this type of weapon; however, a police officer in a 2025 case has described a 40-mm less lethal launcher as "a shoulder fired less lethal weapon which uses a propellant cartridge to launch kinetic energy impact munition. The projectiles are made from soft foam rubber." *Est. of Chavez v. Santa Ana Police Dep't*, 804 F. Supp. 3d 1056, 1066 (C.D. Cal. 2025). Generally, "less-lethal" as opposed to "lethal" and "non-lethal" force involves the use of ammunition such as a "bean bag" that can cause serious bodily injury, and in some cases, death. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). Though not definitive here, Officer Drake's use of force from this launcher is not at issue in this action.

After Mr. Frazier was struck, Defendant Reid and other officers continued to converge on the patio. (Doc. 58-7, Reid Decl. ¶ 13.) During their approach, Defendant Reid saw a bystander, later identified as Plaintiff, standing between the officers and Mr. Frazier. (*Id.* ¶ 14.) Despite commands to move out of the way, Plaintiff remained in place with his hands raised, standing directly between one of the approaching officers, Officer Hansen, and Mr. Frazier. (*Id.* ¶¶ 15−16.) When Officer Hansen reached Plaintiff, he moved Plaintiff to the right, placing him directly in front of Defendant Reid. (*Id.* ¶ 17.) Defendant Reid then grabbed Plaintiff and moved him out of the way. (*Id.* ¶ 18.) Defendant Reid says he did so to remove Plaintiff from the "zone of danger" between the officers, who were advancing toward Mr. Frazier with weapons drawn, and Mr. Frazier; however, when he was moving Plaintiff, their feet became entangled, and they both fell to the ground. (*Id.*) Defendant Reid says he held onto Plaintiff during the fall to slow Plaintiff's fall, and once Plaintiff was on the ground, he placed his knee on Plaintiff's right leg to prevent Plaintiff from standing up and placing himself between the other approaching officers and Mr. Frazier. (*Id.* ¶¶ 20−21.)

According to Plaintiff, officers were shouting conflicting commands at the time. (PCSOF ¶ 20.) Plaintiff heard "hands up," "on the ground," "move," and "stay still." (Doc. 64-3 at 3, Pl. Dep. at 59:23−25.) Plaintiff also states that Defendant Reid grabbed him and tackled him. (*Id.* at 9, Pl. Dep. at 82:16.) As a result, Plaintiff suffered a right knee injury, a significant elbow injury, and emotional distress. (DSOF ¶ 33; PCSOF ¶ 33.)

**A. Officer Drake Bodycam**

Video from Officer Drake's bodycam during Officer Drake's charge toward the patio briefly shows Mr. Frazier, dressed in bright red above the waist, standing still on the patio with his arms down at his side, while Plaintiff, dressed in a light grey long-sleeved t-shirt or sweatshirt, stands nearby in a dirt area just between the patio and the parking lot. (Def. Ex. 10, Drake bodycam at 1:50.) Officer Drake continues to charge toward the patio with his less-lethal 40 mm launcher drawn and yells, "get on the ground now," after which, Mr. Frazier briefly crouches with his back to the officers and his arms splayed out to the

sides, and Officer Drake fires the launcher. (*Id.* at 1:50–53.) The barrel of the launcher momentarily blocks out the view from Officer Drake's bodycam, but when Mr. Frazier is again visible on the video, he is lying face down on the patio with his feet pointed toward the officers. (*Id.* at 1:54–58.)

Meanwhile, Plaintiff can be seen standing in the dirt area just in front of the patio entrance, and several officers yell, "move!" and "get out of the way!" (*Id.* at 1:57–58.) Officer Hansen and Defendant Reid run forward towards Plaintiff, who stares back at them while holding up his arms with his hands on top of his head. (*Id.*) Officer Hansen collides with/shoves Plaintiff to the right, and Defendant Reid grabs Plaintiff under his armpits and pushes him further to the right, across the patio entrance and in front of the first of several large brightly painted planters lining the patio perimeter. (*Id.* at 1:58–2:00.) While this altercation takes place, Mr. Frazier remains lying face down on the patio with his arms outstretched in front of him, and based on the movement of the video, Officer Drake continues onto the patio. (*Id.* at 2:01–02.) Several other officers also charge onto the patio with weapons drawn and surround and apply handcuffs to Mr. Frazier. (*Id.* at 02:02–08.)

**B. Defendant Reid Bodycam**

Defendant Reid's bodycam video of the altercation with Plaintiff also shows Defendant Reid, joined by Officer Hansen, charge toward Plaintiff. At the time, Plaintiff is standing facing sideways on the path leading to the bar patio, while Mr. Frazier is lying face down inside the patio several feet away. (Def. Ex 9, Reid bodycam at 02:52.) As he moves steadily toward Plaintiff, Defendant Reid repeatedly shouts, "get out of the way, get out of the way," and Plaintiff yells back, "which way?" (*Id.* at 02:52–54.) At about the same time, both Officer Hansen and Defendant Reid collide with/take hold of Plaintiff. (*Id.*) For the next two seconds, Defendant Reid's bodycam video is largely blacked out due to rapid movement and body contact, though in split-second segments it appears Defendant Reid continues to hold and/or push Plaintiff with his hands just below Plaintiff's armpits, and Plaintiff either twists his upper body around or is twisted around by Defendant Reid and begins to fall backwards while twisting or being twisted to the side. (*Id.* at

02:55–57.) When the camera settles, Plaintiff is on his left side on the ground with his face turned up toward Defendant Reid, and Defendant Reid or another officer has a hand on Plaintiff's upper right side. (*Id.* at 02:57.) Defendant Reid yells, "I said get out of the way," and Plaintiff yells back, "I said 'which way?'" (*Id.* at 2:58–59.)

**C. Officer Hanson Bodycam**

Officer Hanson's bodycam video shows the far end of the parking lot from the right side, while several officers walk directly ahead, toward the patio. (Def. Ex. 11, Hanson bodycam at 00:20.) Defendant Reid can be seen walking forward, pointing an arm directly ahead, while yelling, "right there, you in the red, put your hands up right now," and "everybody get away from him right now!" (*Id.* at 00:24–34.) Officer Hanson asks, "are we talking about that guy?" and Defendant Reid continues to point and says, "yes, straight ahead, straight ahead." (*Id.* at 00:42.) Seconds later, the shots from Officer Drake's less-lethal weapon can be heard on the video. (*Id.* at 00:48.) Officer Hanson continues to charge forward with a firearm drawn and says, "give me cover." (*Id.* at 00:48–50.) At the same time, the video shows Plaintiff standing on the path leading to the patio, directly in front of Officer Hanson. (*Id.* at 50.) Officer Hanson yells "move!" while still charging forward, and about the same time, Defendant Reid can be heard yelling, "get out of the way, get out of the way." (*Id.* at 00:50–51.) For a second or two, Plaintiff is clearly visible on the video standing to the left of center of path leading to the patio with his hands on his head; behind Plaintiff, Mr. Frazier is visible in a prone position on the patio. (*Id.*)

The video view then becomes mostly blocked, as Officer Hanson and Defendant Reid collide with Plaintiff; then it shows Defendant Reid grappling with Plaintiff to the right of Officer Hanson and in front of the planter. (*Id.* at 00:52–53.) At about the same time, Officer Hanson and at least two other officers enter the patio where Mr. Frazier is laying on the ground and one of them shouts, "hands up, do not reach!" and several more officers charge onto the patio. (*Id.* at 00:53–01:03.)

**D. Officer Rodriguez Bodycam**

Officer Rodriguez's bodycam also shows several officers, including Defendant

Reid, rush toward the bar after Mr. Frazier is down. (Def. Ex. 12, Rodriguez bodycam at 02:50–55.) As seen from behind, Defendant Reid starts gesturing outward with his right arm and yells, "get out of the way, get out of the way." (*Id.*) As Defendant Reid continues forward, Plaintiff can be seen on the path facing Defendant Reid; Plaintiff has his arms raised and his hands on his head. (*Id.* at 02:55–56.) Officer Hansen stands just to Plaintiff's left. (*Id.*) As he makes face-to-face contact with Plaintiff, Officer Reid reaches out and grabs Plaintiff under the armpits and turns him to the right, and Plaintiff starts flailing backwards in front of a planter with his arms in the air. (*Id.* at 02:57–58.) Plaintiff then falls backward with Defendant Reid still holding or pushing him, and the two of them drop out of Officer Rodriguez's camera view as Officer Rodriguez moves onto the patio, where several officers surround Mr. Frazier. (*Id.* at 2:59–3:01.)

### E. Barcoa Surveillance Video

Surveillance video from the Barcoa patio around 8:33 p.m. shows several patrons walking in a group from the parking lot, across the patio, and into the bar while a siren sounds in the distance and male voices can be heard yelling things like, "hey, turn around, get out of here." (Pl. Ex. A at 00:20–28.) Mr. Frazier, who is wearing a bright red, waist-length jacket covering all but the hood of a black hoodie, is standing just outside the patio with Plaintiff, looking towards flashing police lights in the parking lot. (*Id.* at 00:20–23.) Two men come out of the bar/restaurant onto the patio, facing the police activity, and one of them, wearing a muted plaid hooded jacket, puts his hands up. (*Id.* at 0:23–27.) There is no audio on this or any remaining portion of the surveillance video. Meanwhile, Mr. Frazier remains standing near the entrance to the patio, facing the parking lot, and then suddenly turns around and gets into a crouched position with his arms extended out to his sides. (*Id.* at 00:38.) Mr. Frazier continues to move around on the patio with his hands out to his sides and then appears to get hit with something from behind, causing him to plunge face forward onto the patio with his feet outstretched toward the parking lot. (*Id.* at 00:38–42.) While on the ground, Mr. Frazier initially rolls around and then comes to rest with his arms outstretched in front of him. (*Id.* at 00:38–47.)

While this takes place, Plaintiff remains standing just outside the patio perimeter with his hands in the air, and a group of police officers rushes forward from the parking lot toward the patio. (*Id.*) One of the officers, identifiable from the other videos as Defendant Reid, rapidly pushes Plaintiff backward and to the right across the patio entrance and behind a planter. (*Id.* at 00:47−51.) The view of their bodies is momentarily blocked by foliage from the planter, but the video then shows Defendant Reid emerge on the other side of the foliage in a crouched or kneeling position. (*Id.* at 00:51−54.) Roughly simultaneously, a group of male officers charges onto the patio. (*Id.*)

When the officers reach the patio entrance, Mr. Frazier, who is still lying in a prone position on the ground, has his left arm outstretched in front of him, pointed to the left, and his right arm pointing backward against his right side, and he then pulls his right arm forward and places it out in front of him to the right. (*Id.* at 00:51−53.) Then, about eight male officers rush onto the patio and surround Mr. Frazier. (*Id.* at 00:53−01:03.) As this happens, Defendant Reid, who is still outside the patio on the other side of the line of planters, reaches a hand forward to help pull Plaintiff up, and Plaintiff again becomes visible, limping around behind the planters, and appears to grab his knee. (*Id.* at 01:00−13.)

## IV. Fourth Amendment Claim

### A. Legal Standards

#### 1. Fourth Amendment

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.*

To determine whether a Fourth Amendment violation occurred, the court conducts a three-step analysis assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham*

factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396–97; *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was " greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). This is because " [t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Where video evidence is available in an excessive use-of-force case, the Supreme Court has stated that courts "should [] view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Courts will take the nonmovant's version of the facts as true where video evidence, seen in a light most favorable to the nonmoving party, leaves room for genuine dispute. Courts must still draw all reasonable inferences in the nonmovant's favor. *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott*, 550 U.S. at 381 n.8. But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, can support the finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689,

701 (9th Cir. 2005). Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

**2. Qualified Immunity**

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald* , 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in each case).

Whether a right was clearly established must be determined "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991). Thus, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right;" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

**B. Discussion**

Defendants argue that Defendant Reid's conduct did not constitute a Fourth Amendment violation and that, in any event, Defendant Reid is entitled to qualified immunity because Plaintiff cannot show that Defendant Reid's contact with Plaintiff while attempting to apprehend a criminal suspect violated a statute or the Constitution. (*Id.* at 8–12.)

Plaintiff argues that there are, at a minimum, triable issues of fact whether Defendant Reid violated his Fourth Amendment rights when he forcefully tackled Plaintiff into a concrete planter, causing severe injuries. (Doc. 63 at 11.) Plaintiff argues that, under the relevant *Graham* factors, Defendant Reid knew Plaintiff had not committed any crime and had not threatened any officer or acted aggressively when he employed significant force against Plaintiff. (*Id.*) Plaintiff also argues that the officers, including Defendant Reid, lacked a coherent plan and appropriate supervision when they approached the bar; Mr. Frazier was clearly wearing a valet jacket, not a hoodie; and Mr. Frazier also was not posing a threat, trying to flee, or actively resisting arrest at any point during the incident. (*Id.* at 11–12.)

**1. *Graham* Analysis**

The Court first considers the nature of the force inflicted. Construing the video evidence in Plaintiff's favor, Defendant Reid grabbed Plaintiff with both hands, just under the armpits, rapidly pushed him several feet to the right, and forcibly twisted Plaintiff's upper body to the side and backwards while pushing him down. Although not clearly seen on video, the Court also takes as true that, during the take-down, Plaintiff collided with a concrete planter, resulting in significant injuries to his knee and elbow.

This use of force resembles the "reverse reap throw" maneuver, which involves "tripping the subject from behind to throw him off balance and then 'guiding' him to the ground with both hands," that the Ninth Circuit described in *O'Doan v. Sanford* as a "modest deployment of force." 991 F.3d 1027, 1033, 1036–37 (9th Cir. 2021). Plaintiff's collision with the planter and physical injuries to his knee and his elbow, which Plaintiff

says was cracked and later required surgery (*see* PCSOF ¶ 33; Doc. 64-3 at 23−25, 175:4−5, 176:19−24, 177:5), could support a higher level of force because, although it is the amount of force, not the amount of injury, that matters in the use-of-force context, courts may consider "the severity of injuries in evaluating the amount of force used." *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018); *Bryan v. MacPherson*, 630 F.3d 805, 824–25 (9th Cir. 2010) ("The presence of non-minor physical injuries . . . is certainly relevant in evaluating the degree of the Fourth Amendment intrusion.").

Defendant Reid's takedown of Plaintiff was not as forceful, however, as the takedown in *Rice v. Morehouse* that the Ninth Circuit described as "substantial" and "aggressive," wherein two officers held a passively resistant misdemeanor suspect's arms behind his back, tripped him, and forcibly threw him face-down onto the pavement. 989 F.3d 1112, 1121 (9th Cir. 2021). Nor does Defendant Reid's use of force rise to the level of the "substantial" force used by two plainclothes detectives on a non-resistant, unsuspecting criminal suspect who was exiting a courthouse in *Andrews v. City of Henderson*, wherein the officers lunged without warning at the suspect, and one of the officers tackled him to the ground, while the other officer landed on top of them, causing the suspect a fractured hip, requiring two surgeries. 35 F.4th 710, 714 (9th Cir. 2022). Although Plaintiff likewise suffered serious injuries, the evidence construed in Plaintiff's favor does not support that Defendant Reid threw Plaintiff headfirst to the ground or that Plaintiff was tackled by multiple officers from which to infer the nature of the force was substantially more aggressive than the reverse-reap throw used in *O'Doan*, which the Ninth Circuit characterized as modest force. 991 F.3d at 1037 ("The reverse reap throw maneuver that Officer Sanford used—a tripping technique that knocked O'Doan off balance and allowed Sanford to bring O' Doan to the ground—[] involved a modest deployment of force."); *cf. Carr v. Cnty. of San Diego*, No. 19-CV-1139 JLS (MDD), 2021 WL 4244596, at *13 (S.D. Cal. Sept. 17, 2021) ("putting Plaintiff into a headlock, slamming him to the ground, and then having multiple officers put their bodyweight on him would appear to be at least an intermediate use of force"); *Sheridan v. Trickey*, No. CIV. 10-06034-AC, 2010

WL 5812678, at *5 (D. Or. Dec. 16, 2010), *report and recommendation adopted*, No. CV 10-6034-AC, 2011 WL 588769 (D. Or. Feb. 10, 2011) (slamming subject's head against the asphalt with sufficient force to knock him unconscious and fracture his face is at least intermediate force). On balance, Defendant Reid employed modest to intermediate force.

The Court next considers the government interests at stake, which generally requires assessing the severity of the crime at issue, the threat posed by the suspect, and whether the suspect was resisting arrest. *Graham*, 490 U.S. at 396–97. "These factors, however, are not exclusive. . . . we examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010).

It is undisputed that Plaintiff was not suspected of any crimes or posing a threat. Nonetheless, the Court must assess the government interest at stake based on the totality of the circumstances, and here, Defendant Reid and the other officers approaching the outdoor patio were responding to a report that a suspect in the area had a gun and had recently shot at police. Thus, the severity of the crime at issue—an armed suspect who had shot at police officers—and the perceived threat posed to the officers and the public by that suspect remaining at large was potentially life-threatening.

The evidence also shows that Defendant Reid was informed by dispatch that the suspect was a black male wearing a red hoodie, and based on the video evidence, Defendant Reid saw a black male on the patio dressed in red from the waist up and called out, "you in the red, put your hands up, right now!" and "everyone get away from him, right now!" (*Id.* ¶ 19; Def. Ex. 9, Reid bodycam at 01:21–35.) From Defendant Reid's position facing Mr. Frazier from across the parking lot, a reasonable officer could have reasonably suspected that this individual, who was the only person in view matching this description, was the shooting suspect. Even up close, the video shows that Mr. Frazer was dressed from the waist up in a fully closed red jacket, which a reasonable officer in Defendant Reid's position could have reasonably, though mistakenly, thought was a red hoodie.

Additionally, even after Officer Drake struck Mr. Frazier with a 40 mm round from

his less-lethal weapon, knocking him to the ground, Mr. Frazier was not yet detained, and his hands were not raised in the air or visible to the approaching officers. Under these circumstances, a reasonable officer, believing that Mr. Frazier was the shooting suspect, could have reasonably believed he had a gun and could access it and again start shooting at police, thereby posing an immediate and ongoing threat of serious bodily harm to the approaching officers and any individuals remaining in the immediate vicinity.

Taken together, these facts demonstrate a high government interest at stake in the officers reaching the patio and detaining the individual they believed was the shooting suspect. By the same token, there was a high government interest at stake in clearing anyone out of the immediate area for their own safety and in removing anyone out of the path whom a reasonable officer could have reasonably believed was impeding police access to the suspect.

The Court must next consider whether the moderate to intermediate force Defendant Reid used to remove Plaintiff from the immediate area directly in front of the patio and out of the path of several oncoming officers was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537.

Plaintiff disputes that he was impeding the approach of the officers based on video evidence, which he says shows that "[n]umerous officers had an unimpeded path into the patio." (PCSOF ¶ 24.) He also notes that Officer Drake "had a direct and unimpeded path toward Aaron Frazier" when he fired a less lethal round and hit Mr. Frazier. (*Id.*)

Construing the video evidence in Plaintiff's favor, several officers approaching the patio from the right could have reached the dirt area in front the patio then turned and gone through the open gap in planters directly behind Plaintiff to access Mr. Frazier. (Doc. 62, Pl. Ex. A at 0:47). Officer Drake, who was charging straight ahead towards Plaintiff, had also been able to earlier aim and shoot a round from his less-lethal launcher past Plaintiff to strike Mr. Frazier. (Def. Ex. 10 at 01:53−54.) Additionally, based on Officer Hansen's bodycam video, Plaintiff was standing sightly to the left of center of the patio entrance, likewise potentially permitting Officer Hansen, Defendant Reid, or other officers charging

straight ahead to pass Plaintiff on the right and potentially access the patio without colliding with Plaintiff. (Def. Ex. 11 at 00:49.)

Nonetheless, it is also clear from the video evidence that Plaintiff was at least partially blocking the officers' rapid advance toward the patio entrance and was standing in an area where a reasonable officer could have reasonably believed shots might be fired. The question of whether it was objectively reasonable for Defendant Reid to forcibly shove and take Plaintiff down to the ground under these circumstances must also be viewed from "the perspective of a reasonable officer on the scene," not "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). Inferring in Plaintiff's favor that some of the officers could have reached the patio and thereby could have potentially nullified the perceived threat without colliding with Plaintiff and without any shots being fired, police officers are not required to avail themselves of the least amount of force available in a rapidly evolving situation. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). This is because "[r]equiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . . [and] would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves. . . . [when acting] under stress and subject to the exigencies of the moment." *Id.*; *see also Graham*, 490 U.S. at 396−97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation"). Applying this standard to the evidence presented here, the moderate to intermediate force Defendant Reid used to shove Plaintiff out of the path and take him to the ground was objectively reasonable in relation the high government interests at stake.[5] Accordingly, Plaintiff

---

[5] Although not developed in his Response, Plaintiff's apparent contention in his Statement of Facts that these actions were unreasonable because several officers were shouting conflicting commands, including that Officer Drake was shouting "hold, hold, hold" just before Defendant Reid took Plaintiff to the ground (PCSOF ¶¶ 24−25), and Plaintiff's argument based on the opinion of Plaintiff's police expert, Mr. Bercovici, that

cannot show a Fourth Amendment violation, and his claim against Defendant Reid fails on the merits.

**2. Qualified Immunity**

In the alternative, even if a reasonable jury could find that the force Defendant Reid used was excessive, Defendant Reid is entitled to qualified immunity if he did not violate any clearly established rights of which a reasonable officer would have known or he could have reasonably believed that his actions were lawful. *Romero*, 931 F.2d at 627.

Defined with particularity and construed in Plaintiff's favor, the right at issue here is the right of a passive bystander to a police call involving a suspected shooter to be free from a forceful takedown, causing significant injuries, where the bystander is not posing a threat but is in the path between the suspect and several responding officers.

Plaintiff argues that *Andrews*, which the Court discussed above, and *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007), which *Andrews* cited, would have put a reasonable officer in Defendant Reid's position on notice that his actions were unlawful. (Doc. 63 at 13−14.) As already discussed, in *Andrews*, two officers lunged at, tackled, and piled on top of an unsuspecting and non-resistant criminal suspect as he exited a courthouse, causing him a serious hip injury. The Ninth Circuit found the officers were not entitled to qualified immunity for this use of force, noting in part that, "*Blankenhorn* clearly established . . . that an officer violates the Fourth Amendment by tackling and piling on top of a 'relatively calm,' non-resisting suspect who posed little threat of safety without any prior warning and without attempting a less violent means of effecting an arrest." 35 F.4th at 719. Relying on this citation, Plaintiff argues that it was clearly established at the

---

the officers were not well organized or properly supervised (Doc. 63 at 11−12 ¶¶ 72−81), miss the mark. The question for purposes of Plaintiff's Fourth Amendment claim against Defendant Reid is not whether Plaintiff's failure to move when faced with confusing commands was reasonable or whether the officers, as a whole, could have been more organized or better directed, but whether, under the totality of the circumstances confronting the officers at the time, Defendant Reid's actions were objectively reasonable. The opinion evidence Plaintiff cites from Mr. Bercovici does not address Defendant Reid's actions in particular or create a question of fact that Officer Reid's use of force against Plaintiff was objectively unreasonable under the circumstances.

time of this action that "forcibly tackling (and badly injuring) a person who was standing calmly with hands in the air, not suspected of a crime, and not resisting or posing a threat violates the Fourth Amendment." (Doc. 63 at 13.) Plaintiff further argues that there was even less need for force here because Plaintiff was not suspected of any crime. (*Id.* at 14.)

These arguments are unpersuasive because, even though *Andrews* and *Blankenhorn* also involved the forceful takedowns of non-threatening subjects, neither case speaks to the facts at issue here where Defendant Reid was responding to a perceived threat involving a suspected shooter who was not yet detained, and Plaintiff was standing in the path between several responding officers and the suspect. Quite simply, in *Andrews* and *Blankenhorn*, unlike here, there was no reasonably perceived threat requiring a split-second judgment and response. These cases therefore would not have alerted a reasonable police officer in Defendant Reid's position that shoving Plaintiff out of the way and forcefully taking him to the ground under such circumstances was unreasonable.

*Rice*, upon which Plaintiff also relies, is likewise too far removed from these facts to make this showing. First, as previously discussed, the nature of the force used in both *Andrews* and *Rice* was more extreme than the nature of the force employed here. Although Defendant Reid's takedown resulted in serious injuries, Plaintiff was not tackled or shoved face first to the ground by multiple officers. Instead, construing the video evidence in Plaintiff' favor, Defendant Reid collided with, grabbed, and pushed Plaintiff several feet to the right, then twisted Plaintiff's upper body to the side and shoved Plaintiff against a planter and down to the ground.

More fundamentally, though, *Rice* would not have put a reasonable officer on notice that this use of force was unreasonable under the facts and circumstances in evidence here because, unlike here, there was no reason for the officers in *Rice* to perceive an immediate threat to officer or public safety. Instead, the officers were called to a traffic stop because the driver, who was suspected of a minor traffic violation, was reportedly "just not wanting to comply with [the original officer's] instructions" to show his license. *Rice*, 989 F.3d at 1123. These facts do not speak to the reasonably perceived threat at issue here and are not

sufficiently on point to have clearly established at the time of this action that Defendant Reid's forceful takedown of Plaintiff was unlawful. In short, none of the critical factors that prompted this use of force: an un-detained criminal suspect believed to be armed and to have recently shot at police, a rapidly evolving arrest operation, and a bystander in the pathway between oncoming officers and the suspected shooter—or any other comparable factors necessitating the use of force—were at play in *Andrews*, *Blankenhorn*, or *Rice*.

Finally, *Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013), although more analogous to this action because it likewise involved the use of force against an unresisting bystander, also does not speak to the exigency of the circumstances confronting the officers here. In *Blondin*, police responded to a suicide call in which the subject was sitting in his car outside his house with a tube running from the car exhaust to the interior. *Id.* at 1089. Although he eventually complied with the officers' requests to exit the car, the subject, whom the officers were told had a gun, refused commands to show his hands, and the officers twice tased him and were holding him on the ground when a neighbor came outside and, from 37 feet away, called out, "what are you doing to Jack?" *Id.* at 1089–90. As here, the officers yelled conflicting commands at the neighbor, with one of them yelling "stop," and another yelling, "get back," and the neighbor reportedly "appeared frozen with fear" but made no threatening gestures. *Id.* at 1090. Then one of the officers warned the neighbor he would be tased if he did not leave, but without waiting for a response, tased him in dart mode, knocking him to the ground and causing him excruciating pain and other injuries. *Id.* The Ninth Circuit found that the officer's use of the taser "involved an intermediate level of force with physiological effects, [ ] high levels of pain, and foreseeable risk of physical injury." *Id.* at 1091 (internal quotation marks and citation omitted). And the court went on to deny qualified immunity to the officer, finding that "[t]he right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008," and that it was "beyond debate" that "using non-trivial force in response to such passive bystander behavior would be unconstitutionally excessive." *Id.* at 1096.

*Blondin* also would not have placed a reasonable officer in Defendant Reid's position on notice that Defendant Reid's takedown of Plaintiff was unlawful. Most notably, in *Blondin*, the officers were already holding onto the intended subject, so there was no immediate threat, and the neighbor, who was 37 feet away, was not in any way impeding the officer's access to or ability to detain that individual. These facts would not have placed a reasonable officer in Defendant Reid's position on notice that using modest to intermediate force to remove a bystander from the path between police and a suspected shooter who had already been knocked down but was not yet detained was excessive in relation to the government interests at stake.

Because it was not clearly established at the time of this action that this use of force was objectively unreasonable under the circumstances, and Defendant Reid could have reasonably believed that his takedown of Plaintiff was lawful, Defendant Reid is entitled to qualified immunity. *Romero*, 931 F.2d at 627. Accordingly, even if a constitutional violation took place, Plaintiff's Fourth Amendment claim against Defendant Reid fails as a matter law, and the Court will grant summary judgment to Defendants on this claim.

## V. State Law Claims against Defendant Reid

Defendants argue that Defendant Reid is entitled to summary judgment on Plaintiff's state law claims against him for failure to comply with Arizona's notice of claim requirement. (Doc. 57 at 6–8.)

### A. Notice of Claim Requirement

Arizona Revised Statutes § 12-821.01(A) requires that

> [p]ersons who have claims against a public entity or a public employee shall file claims with the person or persons authorized to accept service for the public entity or public employee as set forth in the Arizona rules of civil procedure within one hundred eighty days after the cause of action accrues. The claim shall contain facts sufficient to permit the public entity or public employee to understand the basis upon which liability is claimed. The claim shall also contain a specific amount for which the claim can be settled and the facts supporting that amount. Any claim which is not filed within

> one hundred eighty days after the cause of action accrues is barred and no action may be maintained thereon.

Ariz. Rev. Stat. § 12-821.01(A). "When a person asserts claims against a public entity and public employee, the person 'must give notice of the claim to *both* the employee individually and to his employer.'" *Harris v. Cochise Health Sys.*, 160 P.3d 223, 230 (Ariz. Ct. App. 2007) (quoting *Crum v. Superior Court,* 922 P.2d 316, 317 (Ariz. App.1996)) (emphasis in original).

The purpose of the notice of claim statute is to allow the public entity and public employee the opportunity to investigate and assess their liability, to permit the possibility of settlement prior to litigation, and to assist the public entity in financial planning and budgeting. *Harris*, 160 P.3d at 230; *see Johnson v. Superior Ct. In & For Cnty. of Pima*, 763 P.2d 1382, 1384 (Ct. App. 1988) (noting that, "[i]n drafting § 12–821(A) to require that notice of claims be given to both the public entity and the public employee individually, the legislature insured that Arizona and its political subdivisions, as well as its employees, will be afforded the opportunity to investigate, settle and fully defend any claim against them). Arizona courts have held that plaintiffs who do not strictly comply with the statute's requirements are barred from bringing suit. *See Salerno v. Espinoza*, 115 P.3d 626, 628 (Ariz. Ct. App. 2005); *Harris*, 160 P.3d at 230; *Falcon ex rel. Sandoval v. Maricopa Cnty.*, 144 P.3d 1254, 1256 (Ariz. 2006) ("Actual notice and substantial compliance do not excuse failure to comply with the statutory requirements").

When applying state law, federal courts are bound by the decision of the highest state court and, absent a controlling state court decision, have a duty to predict "how the highest state court would decide the issue." *In re Kekauoha-Alisa*, 674 F.3d 1083, 1088 (9th Cir. 2012) (internal citations omitted).

**B. Plaintiff's Notice of Claim**

On May 16, 2023, Plaintiff mailed a Notice of Claim form to the City. (DSOF ¶ 35, Doc. 58-16 at 2.) Plaintiff used the "City of Phoenix Claim Form," which states at the top, "[t]his claim form is provided to assist in presenting a claim against the City of Phoenix

that complies with the requirements of Arizona Revised Statutes § 12-821.01[,] which defines the requirements for filing a claim against a public entity in the State of Arizona." (Doc. 58-16 at 2.) The form goes on to explain that, to comply with the statute, the claim must be filed with the City Clerk Department within 180 days after the cause of action accrues; contain sufficient facts to permit the public entity to understand the basis of the claim against it; contain a specific dollar amount for which the claim can be settled, along with facts supporting that amount; and be filed prior to filing a lawsuit against the public entity, which must be filed within one year after the cause of action accrues. (*Id.*)

In his Notice of Claim, Plaintiff stated that the events giving rise to his claim took place at 829 N. 1st Ave on December 11, 2022 at approximately 8:30 p.m. (*Id.* at 3.) In response to the same portion of the form, asking him to describe "the specific facts of the occurrence, event, act or omissions that you believe caused your injury" and to explain, "for each theory of liability, . . . why you believe the City of Phoenix is at fault" (*id.* at 3), Plaintiff wrote that he

> was standing on the sidewalk outside of the patio at Barcoa Agaveria, a bar that he co-owns. Purportedly, cops were in the surrounding area looking for someone who had shot a gun. As a result, people were taking refuge in the bar. Over 10 Phoenix police officers approached and one of the officers shot a rubber bullet at a valet driver standing on the patio of the bar. Mr. Gardner complied with officers' commands by putting his hands up. Despite his compliance, Officer Johnny Reid (#9669) resorted to using force against Mr. Gardner. Officer Reid pushed Mr. Gardner across the path where the other officers were approaching, including the officer who had shot a rubber bullet. Officer Reid shoved Mr. Gardner several feet into a planter, causing him to hit his head, fall to the ground, and suffer injuries.

(*Id.* at 6.) Plaintiff requested the following damages: $200.00 in property damages, $3,000.000.00 in personal injury damages, and $2,000,000.00 in other damages, for a total dollar amount of $5,000,200.00 to settle his entire claim. (*Id.* at 4.) In the explanation of damages section of the form, Plaintiff wrote for property damages, "[w]hen Officer Reid

pushed Mr. Gardner into the planter, it damaged the planter"; for personal injuries, he wrote that he underwent extensive knee and ACL surgeries, was advised that recovery could take nine to twelve months, and he still suffers elbow and knee pain and requires ongoing treatment; for other damages, he included severe emotional distress, fears of falling, limited ability to play with his son and participate in personal and professional activities, and missed work and work opportunities. (*Id.* at 4, 6.)

In addition to mailing this Notice of Claim to the City, on May 26, 2023, Plaintiff served a copy of this same claim form on Defendant at the Mountain View Precinct of the Phoenix Police Department, 2075 E. Maryland Avenue in Phoenix.[6] (*Id.* at 7; DSOF ¶ 38.) Neither the City nor Defendant responded to the claim. (Doc. 16 ¶¶ 4–5.)

**C. Discussion**

Defendants argue that Plaintiff failed to strictly comply with Arizona's notice of claim statute when he served his Notice of Claim on Defendant Reid because he merely served a copy of the same Notice of Claim he mailed to the City on the "City of Phoenix Claim Form," which Defendants argue exclusively pertains to claims against the City. (Doc. 57 at 7.) Defendants also argue that, in his Notice of Claim, Plaintiff failed to substantively refer to Defendant Reid and that "nothing in the City Claim Form alerted Officer Reid to the fact that a claim was being asserted against him personally." (*Id.*) Finally, Defendants argue that the Notice of Claim was deficient because it did not contain a sum certain Plaintiff would accept to settle any intended claim against Defendant Reid, separate from his claim against the City. (*Id.*) Based on these alleged defects, Defendants argue that "[t]he delivery of the City Claim form to Officer Reid notwithstanding, Plaintiff did not provide Officer Reid with an opportunity to investigate and assess his liability, consider the possibility of settlement, and plan and budget for litigation: the very purpose of A.R.S. § 12-821.01(A)." (*Id.* at 7–8 (citing *Harris*, 160 P.3d at 23).)

---

[6] The Court takes judicial notice based on publicly available information from the Phoenix Police Department that this is the address of the Department's Mountain View Precinct. *See* https://www.phoenix.gov/administration/departments/police/public-safety-services/find-my-precinct/mountain-view-precinct.html (https://perma.cc/PJF7-FGCU).

Plaintiff argues that it is undisputed that he separately served both the City and Defendant Reid, as required by the notice of claim statute, and he argues that the notice "repeatedly mentions Defendant Officer Reid by name and contains a lengthy and detailed description about his individual liability to Plaintiff." (Doc. 63 at 8.) Plaintiff argues that this is all that was required to comply with the plain language of the statute, which requires service on the public entity and public employee and that the notice contain "facts sufficient to permit the public entity or public employee to understand the basis upon which liability is claimed." (*Id.* (quoting Ariz. Rev. Stat. § 12–821.01).) Plaintiff argues that the statute does not contain any requirements pertaining to the form, and he argues Defendants fail to cite any authority that reads any form requirements into the statute. (*Id.*) Finally, Plaintiff argues based on *Havasupai Tribe of Havasupai Reservation v. Arizona Board. of Regents*, 204 P.3d 1063, 1080 (Ariz. App. 2008), that he was not required under the statute to provide individual settlement amounts for each intended tortfeasor. (*Id.* at 9−10.)

There is no material dispute that Plaintiff separately served a notice of claim on both the City and Defendant Reid, as is required when bringing a claim against both the public entity and a public employee. *Harris*, 160 P.3d at 230. Contrary to Defendants' arguments, the Notice of Claim also set forth ample facts about Defendant Reid's use of force and Plaintiff's injuries, including that Defendant Reid "shoved Mr. Gardner several feet into a planter, causing him to hit his head, fall to the ground, and suffer injuries," and "[w]hen Officer Reid pushed Mr. Gardner into the planter, it damaged the planter," that would "permit the public entity or public employee to understand the basis upon which liability is claimed." Ariz. Rev. Stat. § 12–821.01. The notice also satisfied the statutory requirement that the claimant set forth a specific amount for which the claim or claims can be settled. The Arizona Supreme Court has made clear that, to satisfy this requirement, a notice of claim need not provide individualized settlement amounts for each tortfeasor. *See Havasupai Rsrv.*, 204 P.3d at 1080 ("we do not read A.R.S. § 12–821.01 to require that one who asserts a single claim against multiple public entities or employees must make separate settlement demands on each of the various alleged individual wrongdoers").

The only remaining question, then, is whether using the City's Notice of Claim form, which contains a heading stating it was formulated "to assist in presenting a claim against the City of Phoenix," without making any changes or additions to the form or otherwise substantively identifying Defendant Reid as a separate party at fault from the City, was sufficient to give Defendant Reid notice of an intended claim against him. Neither party cites to any controlling Arizona law addressing this issue, nor was the Court able to find any Arizona Supreme Court or Courts of Appeals decisions addressing whether a notice of claim form served on a public employee that only identifies the public employer, not the public employee, as an intended defendant, is sufficient to comply with § 12–821.01 for the sake of any claim later brought against the public employee.

Defendant argues that Plaintiff's Notice of Claim only provided Defendant Reid notice of Plaintiff's claim against the City arising from an incident in which Defendant Reid was involved and therefore "did not . . . serve the statutory purpose as far as Officer Reid is concerned individually." (Doc. 66 at 3.) Defendant relies in part on *Baker v. City of Tempe*, No. CV 07-1553-PHX-MHM, 2008 WL 2277882, at *2 (D. Ariz. May 30, 2008), a federal District Court case, in which the court found the plaintiff failed to strictly comply with Arizona's notice of claim statute for suing individual defendants because he only served the City and "did not serve a Notice of Claim directly on any of the Individual Defendants." The court also noted that the plaintiff did not "name the Individual Defendants as potential litigants in the Notice of Claim he sent to the City." *Id.* Instead, the notice said only that "[n]otice is hereby given pursuant to A.R.S. § 12–821.01 that Mr. Baker intends to bring causes of action *against the City of Tempe and the Tempe Police Department* for the intentional tort and emotional and mental impairment." *Id.* (emphasis added).

Defendant also relies on another federal District Court case, *Adame v. City of Surprise*, No. CV-17-03200-PHX-GMS, 2018 WL 3209388, at *5 (D. Ariz. June 29, 2018), in which the court found the plaintiff failed to comply with Arizona's notice of claim statute for an individual police officer because, "[a]lthough the Notice of Claim

includes a recitation of Officer Gruver's alleged misconduct in the background section, the Notice of Claim is neither addressed to or served upon Officer Gruver, nor does it identify him as a party to the claim."

Neither *Baker* nor *Adame* are on all fours with the facts presented here because, unlike in those cases, where the plaintiff never served the individual defendants, Plaintiff served Defendant Reid a copy of his Notice of Claim, and in it, he alleged specific actions by Defendant Reid that caused his alleged injuries. As in those cases, however, Plaintiff's Notice of Claim was not addressed to Defendant Reid and never identified Defendant Reid as an intended party. Even though it was served on Defendant Reid directly, so there can be no doubt Defendant Reid was the intended recipient of the notice, the notice form, itself, expressly stated that it was intended to assist claimants in "presenting a claim against the City of Phoenix." (Doc. 58-16 at 2.) Moreover, in completing that form, Plaintiff was required to explain "why you believe the *City of Phoenix* is at fault"—a phrase Plaintiff rewrote word-for-word in his attachment, which he used to describe the "Occurrence or Events Giving Rise to the Claim." (*Id.* at 3, 6 (emphasis added).) Plaintiff made no amendments or additions to show that he intended to bring a separate claim against Defendant Reid. Even the Proof of Service form, showing service was completed on Defendant Reid at his work address, only lists "City of Phoenix" as the "Defendant." (*Id.* at 7.) Plaintiff provides no other documents or notices that were provided to Defendant Reid at the time of service that would have put Defendant Reid on notice that Plaintiff intended to bring a separate claim against him.

Although Defendant Reid could have inferred, both from being personally served and from being identified in Plaintiff's description of the events supporting Plaintiff's claim against the City, that Plaintiff intended to bring a claim against him, he could also have inferred that the notice was merely to apprise him that his alleged actions were the subject of a potential lawsuit against his employer in which he could be called upon to participate. *Cf. Harris*, 160 P.3d at 230 (dismissing state law claims against a public employee who was timely served a notice of claim against a county entity but was not

identified as a defendant therein, finding she could have concluded she was served merely in her role as a statutory agent for the entity and not in her personal capacity).

In any event, the Arizona Supreme Court has made clear that actual or constructive notice is not enough to comply with Arizona's notice of claim statute. *Falcon*, 144 P.3d at 1256. It follows that serving a public employee a notice of claim that only identifies his employer as the intended defendant and nowhere informs the employee that the claim is also against him, does not "file [a] claim with the [employee]" for purposes of § 12-821.01(A). This interpretation also comports with the statute's legislative intent, which Arizona courts consider when giving effect to a statute's wording. *See Salt River Project/Bechtel Corp. v. Indus. Comm'n of Arizona*, 877 P.2d 1336, 1338 (Ariz. Ct. App. 1994) ("our goal is to effectuate the intent of the legislature which we infer from the language of the statute and the act of which it is part").

In *Johnson*, the Arizona Court of Appeals addressed the then unsettled question of "whether the mandatory notice of a claim required by A.R.S. § 12–821(A) must be presented to an individual public employee as a prerequisite to the maintenance of an action against that employee for injuries resulting from an act or omission allegedly committed in the scope of his employment." 763 P.2d at 1382. *Johnson* relied on both the wording and legislative history of § 12–821(A) to find that the statute "unambiguously provides that both public entities and their employees are entitled to notice of claims against them." *Id.* at 1384. The court noted that, when drafting § 12-821.01(A), the legislature rejected the language of a less precisely worded New Jersey notice of claim statute, which New Jersey courts had construed to mean no separate notice to the public employee was required. *Id.* *Johnson* then went on to find that

> [the Arizona] legislature's inclusion of the words "or public employee" in § 12–821(A) evidences an intent to avoid the interpretation which the New Jersey courts have applied. In drafting § 12–821(A) to require that notice of claims be given to both the public entity and the public employee individually, the legislature insured that Arizona and its political subdivisions, *as well as its employees*, will be afforded the

> opportunity to investigate, settle and fully defend any claim against them.

*Id.*

Applying these same principles of statutory construction and legislative intent here, the Court concludes that Arizona's highest court would find that a notice of claim that is served on both a public entity and a public employee, but that only describes the basis of the claimant's claim against the public entity and nowhere identifies the public employee as an intended party to that claim, does not satisfy § 12-821.01(A)'s requirement that the claimant "file [a] claim with the [employee]." The Court will grant summary judgment to Defendants on Plaintiff's state law claims against Defendant Reid in Counts Two, Three, and Four for failure to strictly comply with § 12-821.01(A).

## VI. Assault and Battery Claims Against the City

Plaintiff asserts Assault and Battery claims against the City in Counts Two and Three based on vicarious liability for Defendant Reid's alleged harmful or offensive contact with Plaintiff. (Doc. 16 at 8−9.) Under Arizona law, "[t]o establish a battery claim, a plaintiff must prove that the defendant intentionally caused a harmful or offensive contact with the plaintiff to occur. *Johnson v. Pankratz*, 2 P.3d 1266, 1268 (Ariz. Ct. App. 2000). "Similarly, a claim for common-law assault requires an allegation that the defendant acted intentionally to cause a harmful or offensive contact and another person is placed in imminent apprehension of the contact. *Gallegos v. Flores*, No. 1 CA-CV 10-0178, 2012 WL 208858, at *3 (Ariz. Ct. App. Jan. 24, 2012). Both claims are intentional torts, but assault does not require the offensive touching or contact to occur. *Id.*

Defendants argue that these claims fail as a matter of law because they require Plaintiff to show that Defendant Reid intended to cause harmful or offensive contact with Plaintiff, and the video evidence supports that Defendant Reid merely tried to move Plaintiff out of his way and out of the zone of danger, but his feet became entangled with Plaintiff's feet, causing them both to fall. (Doc. 57 at 12−13.) Defendants argue that "[t]hese undisputed (and undisputable) facts lead to the inescapable conclusion that

Plaintiff's injuries resulted from an accident and not from any intentional conduct" that would support either an assault or battery claim. (*Id.* at 13.)

Plaintiff disputes that the evidence fails to support intentional conduct, arguing that the video evidence, Defendant Reid's statements that he acted intentionally, and Sgt. Boyd's conclusion that the contact was "not accidental" could lead a reasonable jury to conclude that Defendant Reid intended to cause harmful or offensive contact with Plaintiff. (Doc. 63 at 17.)[7] In their Reply, Defendants acknowledge that Defendant Reid intentionally reached out to move Plaintiff, but they argue that Plaintiff conflates the intent to make physical contact with the intent to harm or offend, as required to prove assault or battery, and they argue that "[t]he record is simply devoid of any evidence upon which a trier of fact could reasonably conclude that Officer Reid acted with this requisite intent." (Doc. 66 at 10−11.)

The Court need not address whether a reasonable jury could find that Defendant Reid intended to harm or offend Plaintiff during his forceful takedown of Plaintiff because, to the extent Defendant Reid acted with an intent to harm or offend, his actions would constitute criminal felonies under Arizona law, and Arizona Revised Statutes § 12-820.05(B) shields the City from vicarious liability for such conduct.

As the Court previously discussed when ruling on Defendants' Motion to Dismiss, under § 12-820.05(B), the City is entitled to statutory immunity for its employees' alleged torts predicated on facts that, taken as true, would constitute criminal felonies unless the City had prior knowledge that the employee had a propensity for such acts. (*See* Doc. 20 at 15.) The Court went on to find that, taken as true, Defendant Reid's alleged intentional conduct underlying Plaintiff's claims in this action would constitute aggravated assault, a

---

[7] Plaintiff cites to Defendant Reid's deposition testimony, agreeing that he "intentionally" grabbed Plaintiff with both hands "with the idea of moving him to a place other than where he was standing at that moment," and the deposition testimony of Sgt. Byrd, who was also on the scene, saying the contact Defendant Reid made with Plaintiff "wasn't accidental," and "there was a legitimate contact between the officer and Mr. Gardner." (PCSOF ¶¶ 32, 66; Doc. 64-1 at 17, Reid Dep. at Doc. 64-5 at 8:9−24, Byrd Dep. at 60:18−23.)

criminal felony under Arizona Revised Statute § 13-1204(A)(1)−(3) and that, unless Defendant Reid "acted in good faith in the lawful performance of his duty," his conduct would also constitute unlawful imprisonment, a criminal felony, under § 13-1303(A)(1)−(3). (*Id.* at 16−17.)

Although the Court did not dismiss Plaintiff's assault and battery claims against the City pursuant to § 12-820.05(B) at that time,[8] it is clear those claims can only be predicated on intentional conduct that, if proven, would constitute criminal felonies under Arizona law. There is also no evidence Defendant Reid had a propensity for such conduct or that, if he did, the City was aware of that propensity. Because of this, even if a reasonable jury could find that Officer Reid acted with an intent to injure or offend, the City is statutorily immune from vicarious liability for such conduct because it was not previously aware Defendant Reid had any propensity for such conduct. Accordingly, Plaintiff's vicarious liability assault and battery claims against the City in Counts Two and Three fail as a matter of law, and the Court will dismiss these claims.

**VII. Remaining State Law Claim**

The Court's June 25, 2024 Order dismissed Count Four of the First Amended Complaint to the extent it alleged a simple negligence/vicarious liability claim against the City. (Doc. 20) Construing the facts alleged in Plaintiff's favor, the Court found that Plaintiff plausibly alleged a claim for gross negligence in Count Four. (*Id.* at 15.)

Under 28 U.S.C. § 1367(c)(3), if a federal district court has dismissed all claims over which it has original jurisdiction, it may, in its discretion, dismiss without prejudice supplemental state law claims brought in the same action. Although a district court is not required to dismiss the supplemental state law claims, "in the usual case in which all

---

[8] In their Motion to Dismiss, Defendants argued only that the City was immune from liability for all of Plaintiff's state law tort claims and did not specifically move to dismiss Plaintiff's assault and battery claims, and the Court found that the dismissal of all Plaintiff's state law tort claims against the City would be premature because Plaintiff asserted negligence and intentional torts as alternative theories of liability, and he alleged sufficient facts to support either of these theories. (*See* Doc. 20 at 18.)

federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, fairness, convenience, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Curtis v. Inslee,* 154 F.4th 678, 696 (9th Cir. 2025), cert. denied, No. 25-1119, 2026 WL 1513282 (U.S. June 1, 2026).

To the extent that Count Four alleges a gross negligence claim against the City, the Court declines to exercise supplemental jurisdiction. Declining supplemental jurisdiction is in the interests of judicial economy, fairness, convenience, and comity, to the parties and to the Arizona courts.

**IT IS THEREFORE ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Partial Summary Judgment (Doc. 57).

(2) Defendants' Motion for Partial Summary Judgment (Doc. 57) is **granted** as follows:

(a) Plaintiff's Fourth Amendment claim against Defendant Reid in Count One is **dismissed**;

(b) Plaintiff's state law claims against Defendant Reid in Counts Two, Three, and Four are **dismissed** for failure to comply with Arizona's notice of claim statute, Ariz. Rev. Stat. § 12–821.01;

(c) Plaintiff's state law assault and battery claims against the City of Phoenix in Counts Two and Three based on vicarious liability for Defendant Reid's actions are **dismissed** based on statutory immunity under Arizona Revised Stat. § 12-820.05(B); and

(d) Defendant Reid is **dismissed** as a defendant in this action;

. . . .

. . . .

. . . .

(3) The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim against the City of Phoenix based on vicarious liability for Defendant Reid's alleged gross negligence in Count Four, and that claim is **dismissed** without prejudice.

(4) This action is **dismissed**; the Clerk of Court must enter judgment accordingly and **terminate** this action.

Dated this 18th day of August, 2026.

Michael T. Liburdi

Michael T. Liburdi
United States District Judge